2009 ND 204

STATE of North Dakota, Plaintiff and Appellee

v.

Darin Wayne DAHL, Defendant and Appellant.

Nos. 20090018, 20090019.

Supreme Court of North Dakota.

Dec. 15, 2009.

Charles A. Stock, Assistant State's Attorney, Crookston, MN, for plaintiff and appellee.

Joel L. Larson, Grand Forks, ND, for defendant and appellant.

VANDE WALLE, Chief Justice.

[¶ 1]  Darin Dahl appealed from criminal judgments filed in December 2008, sentencing him for two counts of harassment and one count of reckless endangerment. Dahl argues the evidence presented was insufficient to support the guilty verdicts and he did not voluntarily, knowingly, and intelligently waive his right to counsel for his second trial.  Competent evidence was presented allowing the juries to draw inferences reasonably tending to prove Dahl's guilt and fairly warranting conviction;  Dahl was competent to waive his right to counsel and represent himself; and Dahl voluntarily, knowingly, and intelligently waived his right to counsel.  We affirm Dahl's convictions, but we remand for correction of the criminal judgments.

[¶ 2]   This appeal encompasses two trials, Dahl's first trial for two counts of harassment, and his second trial for reckless endangerment.  The facts and issues regarding each trial will be discussed separately.

## I.

### Harassment Trial

#### A.

[¶ 3]   In November 2007, Roger Kerber arrived at his home in rural Hannaford to find two messages laced with vulgarities on his answering machine from Dahl.  In the first message, Dahl asked Kerber to repay him for a transmission that Kerber had damaged.  Dahl stated, "I'll probably be over there to … put your horse down or something because I'm out of transportation on account of you."  In the second message, Dahl told Kerber where Kerber could find him to make payment.  Dahl also referred to a previous incident in which Kerber's son had fired a gun at Dahl. Dahl stated he was going to "return fire."

[¶ 4]   The State charged Dahl with two counts of harassment.  At trial on the harassment charges, Dahl, represented by counsel, admitted he had left the messages.  He testified he did not intend to harass or threaten Kerber.  His intention was to get restitution for his transmission.  Dahl testified he left the second message to notify Kerber of where to make payment.

[¶ 5]   Dahl made a motion to dismiss under N.D.R.Crim.P. 29 after the close of the State's case, which the district court denied. The jury convicted Dahl on both counts of harassment.  In December 2008, the district court entered criminal judgments sentencing Dahl to concurrent sentences of 180 days, with credit for 180 days already served.  The criminal judgments incorrectly state Dahl pled guilty.

#### B.

[¶ 6]   Dahl argues the evidence supporting his conviction was insufficient because the State did not prove he acted with the intent to frighten or harass another.  This Court's standard of review when a defendant challenges the sufficiency of the evidence for his conviction is well established:

> Appellate review of the sufficiency of the evidence for a jury verdict is very limited.  When the sufficiency of evidence to support a criminal conviction is challenged, this Court merely reviews the record to determine if there is competent evidence allowing the jury to draw an inference reasonably tending to prove guilt and fairly warranting a conviction. The defendant bears the burden of showing the evidence reveals no reasonable inference of guilt when viewed in the light most favorable to the verdict. When considering insufficiency of the evidence, we will not reweigh conflicting evidence or judge the credibility of witnesses. …   A jury may find a defendant guilty even though evidence exists which, if believed, could lead to a verdict of not guilty.

*State v. Demarais*, 2009 ND 143, ¶ 7, 770 N.W.2d 246 (internal citations and quotes omitted).

[¶ 7]   Section 12.1–17–07(1)(a), N.D.C.C., defines harassment: "A person is guilty of an offense if, with intent to frighten or harass another, the person [c]ommunicates in writing or by telephone a threat to inflict injury on any person, to any person's reputation, or to any property."  This Court has suggested that, when considering the sufficiency of the evidence in a harassment case, we consider the "reasonable recipient," rather than the

"reasonable speaker." *State v. Curtis*, 2008 ND 93, ¶ 5, 748 N.W.2d 709 (citing *DeMers v. DeMers*, 2006 ND 142, ¶ 13, 717 N.W.2d 545). We consider whether a communication is a threat from the viewpoint of a "reasonable person standing in the recipient's shoes." *Id.* (citing *Doe v. Pulaski County Special Sch. Dist.*, 306 F.3d 616, 622 (8th Cir.2002)).

[¶ 8] It is clear that the messages Dahl left included threats. In his first message, Dahl asserted he would "put [Kerber's] horse down," unless Kerber paid him. In his second message, Dahl said he may "return fire" on Kerber's son, in retaliation for some prior incident. A reasonable person standing in Kerber's shoes would take these messages to be threats to damage his property and shoot his son. Viewing the evidence in the light most favorable to the verdicts, the State produced sufficient evidence to raise a reasonable inference that Dahl had communicated threats by telephone to inflict injury on Kerber's property and his son.

[¶ 9] Dahl argues the State did not prove he acted with the intent to frighten or harass another. Dahl testified he did not intend to threaten or harass Kerber. Rather, he intended to get restitution for his transmission and let Kerber know where he could be found to make payment. Dahl argues the State did not present any testimony to contradict Dahl's testimony regarding his intent. However, the messages themselves are evidence of intent. The jury was instructed intent could be proved by circumstantial evidence and it could consider any statement made by Dahl. In addition, the jury was not required to believe Dahl's testimony. *Demarais*, 2009 ND 143, ¶ 7, 770 N.W.2d 246 (citing *State v. Wilson*, 2004 ND 51, ¶ 9, 676 N.W.2d 98). Viewing the evidence in the light most favorable to the verdicts, the evidence presented created reasonable inferences that Dahl acted with the intent to frighten or harass another. Sufficient evidence was presented to support the jury's convictions of Dahl on both counts of harassment.

II.

Reckless Endangerment Trial

A.

[¶ 10] In April 2008, Merlin Lende drove Dahl to Kerber's home. Kerber and an employee were inside the house. Kerber's employee testified that she opened the door after seeing Lende's vehicle approach. Dahl exited the passenger side of the vehicle and asked if Kerber was home and if he had a check ready for Dahl. After the employee told Dahl that Kerber was home, but she did not know about the check, Dahl took out a gun and aimed it at the door of Kerber's home. Kerber's employee shut and locked the door. When she looked out the window, she saw Dahl fire three shots at a shop near the house. After the employee told Kerber what was happening, she saw the vehicle begin to leave. Dahl leaned out of the vehicle's window and fired four shots, shattering a window on the house's sun porch. In total, Dahl fired seven shots on Kerber's property.

[¶ 11] Lende offered a different version of the incident. Lende testified that upon arriving at Kerber's home, he got out of the vehicle and went up to the door. Lende spoke with Kerber's employee and she said that Kerber was home. Lende then went back to the vehicle. After Kerber had not come out of the house for approximately five minutes, Dahl took out a gun and fired three shots at a guide wire. Lende told Dahl to get back in the vehicle, and they drove off. According to Lende, Dahl did not fire out of the vehicle's window as they were leaving.

[¶ 12] While Dahl was firing at the sun porch, Kerber was on the telephone with a sheriff's deputy. After Dahl left, Kerber went outside and inspected the area. He found shell casings on the road in front of the house and observed holes in the siding below the broken window on the sun porch. Later that day, a Griggs County Sheriff's deputy found shell casings in front of Kerber's house. The day after the shooting, the Griggs County Sheriff and two Bureau of Criminal Investigation ("BCI") agents removed two bullets from Kerber's sun porch, one from the siding and one from the window trim.

[¶ 13] Dahl was apprehended in Luverne the day after the shooting. BCI agents searched the home where Dahl was arrested and seized a 7.62x39 caliber SKS rifle. The shell casings found at Kerber's residence were 7.62x39 caliber.

[¶ 14] A BCI agent and an agent from the Bureau of Alcohol, Tobacco and Firearms interviewed Dahl after he was arrested. During the interview, Dahl admitted he "shot a couple of rounds off around the farm" using an SKS. When asked if he knew Kerber and his employee were in the house when he fired, Dahl responded, "Yeah, but I wasn't aiming. I was just swinging my barrel and shooting at the-down at the ground more or less. I probably did hit a little bit on the house, but I was probably being a little reckless or whatever." The State subsequently charged Dahl with reckless endangerment.

[¶ 15] In May 2008, prior to Dahl's first trial on the harassment charges, the district court ordered the North Dakota State Hospital to evaluate Dahl to determine whether he could be held criminally responsible for his actions and whether he was competent to stand trial. The evaluator concluded Dahl had schizophrenia and a personality disorder, not otherwise specified, but he was competent to stand trial and could be held criminally responsible for his actions, if found guilty.

[¶ 16] Before Dahl's second trial, on the reckless endangerment charge, Dahl wrote to the district court asking to dismiss his court-appointed attorney. During the October 2008 pretrial hearing, the district court informed Dahl that he had a right to either represent himself or be represented by an attorney. The district court stated representing one's self is "dangerous." The district court advised Dahl:

> Now, if you want to represent yourself and appear in Court and decide who you are going to call, and I think you have the competency to do that—which I question—whether a person in your situation who is facing serious charges can do that on their own. And I want you to be cautioned about that. It's one of those things that's, I guess, very dangerous to represent yourself when you don't know what you're doing.

The district court confirmed Dahl could hear and understand and he understood he was facing criminal charges before asking Dahl to decide whether he wanted to work with his court-appointed attorney or represent himself.

[¶ 17] Dahl explained he had not been able to work with his attorney. His attorney had refused to subpoena witnesses Dahl had requested. Dahl stated he would represent himself, and he would rather call his witnesses, be convicted, and be sentenced to five years in prison than listen to his court-appointed attorney.

[¶ 18] While discussing the relevancy of witnesses Dahl wanted to subpoena, Dahl asked to call a police officer as a witness in the pretrial hearing to testify that one of his proposed trial witnesses was involved in the manufacture and distribution of methamphetamine. When the

State asked the district court to move the hearing along, the district court responded:

Well, if life was that simple, Mr. Stock, but I'm going to protect the record in this case because I've got a pro se defendant that's—right now, that says he wants to be pro se that is represented and I want to make sure that we've gone through enough dialog[ue] so that I've made some sort of colloquy on the record that he understands that I feel he's treading into very dangerous territory and can be disadvantaged by representing himself. I mean, if he's going to tell me he wants me to relieve [his attorney] and if he wants to represent himself and he knows that he's doing this, I'm going to let him do that and we'll proceed. If that's what he wants to do. But I'm not going to appoint [his previous attorney] back for this trial that's scheduled for next week. You either gotta keep [your attorney] or you have to represent yourself.

Dahl decided to represent himself. The district court dismissed Dahl's court-appointed attorney without appointing standby counsel.

[¶ 19] During voir dire Dahl asked the jury panel questions such as, "Is there anyone here that [sic] born before December 31, 1960?" "How many people here would have fifty thousand dollars to post bail?" "How many people here would know what happened in the United States in—December 5th, 1791?" "How many people here believe David Copperfield made a 747 disappear off the runway?" Dahl also asked whether the potential jurors believed he was a convicted felon, whether they could be fair to the defense, and whether they had experience with firearms.

[¶ 20] During trial, the district court explained to Dahl again that self-representation is "dangerous." The district court stated, "I believe it's voluntary, but I don't think you're doing a very, very sharp job. Now, be that as it may, you have a right to represent yourself when you know what you're doing. And if you don't do a good job, that's up to you." After the jury left for a break, Dahl asked if they were deliberating yet and if court was still in session. The district court responded, "Your actions are showing that you know substantially less than most lawyers that are just barely admitted to the Court and I, again, have—and I want to place in the record, that I have at numerous times cautioned you on representing your self." Throughout the trial, the district court permitted Dahl to represent himself without appointing counsel.

[¶ 21] After the presentation of the State's case, Dahl made a motion to dismiss the charge under N.D.R.Crim.P. 29, which the district court denied. The jury found Dahl guilty of reckless endangerment. In December 2008, the district court entered a judgment sentencing Dahl to two years in prison with credit for time served, and two years of supervised probation. The judgment incorrectly states Dahl pled guilty.

### B.

[¶ 22] Dahl argues he was not competent to waive the right to counsel, and that his behavior should have made the district court aware of his incompetence to waive his right. A criminal defendant has the right to be represented by counsel under the Sixth Amendment to the United States Constitution and Article I, Section 12 of the North Dakota Constitution. *City of Grand Forks v. Corman,* 2009 ND 125, ¶ 8, 767 N.W.2d 847 (citing *City of Fargo v. Rockwell,* 1999 ND 125, ¶ 7, 597 N.W.2d 406). As a corollary, a defendant has the right to self-representa-

tion. *State v. Holbach,* 2007 ND 114, ¶ 8, 735 N.W.2d 862 (citing *Faretta v. California,* 422 U.S. 806, 807, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)). This Court reviews an alleged violation of a constitutional right de novo. *State v. Harmon,* 1997 ND 233, ¶ 16, 575 N.W.2d 635 (citing *State v. LaFromboise,* 542 N.W.2d 110, 112 (N.D. 1996)). Self-representation necessarily requires waiver of the right to counsel. *Holbach,* 2007 ND 114, ¶ 8, 735 N.W.2d 862 (citing *Rockwell,* 1999 ND 125, ¶ 8, 597 N.W.2d 406). A defendant must be competent to waive the right to counsel, and the waiver must be knowing, voluntary, and intelligent. *Godinez v. Moran,* 509 U.S. 389, 396, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) (citing *Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *Johnson v. Zerbst,* 304 U.S. 458, 468, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)); *Holbach,* 2007 ND 114, ¶ 9, 735 N.W.2d 862 (citing *State v. Dvorak,* 2000 ND 6, ¶ 12, 604 N.W.2d 445; *Rockwell,* 1999 ND 125, ¶ 9, 597 N.W.2d 406; *Harmon,* 1997 ND 233, ¶ 22, 575 N.W.2d 635).

## C.

[¶ 23] The test to determine whether a defendant is competent to stand trial is "whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." *Godinez,* 509 U.S. at 396, 113 S.Ct. 2680 (quoting *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam)) (internal quotations omitted). In *Godinez,* the United States Supreme Court used the same test to determine whether a defendant was competent to waive his right to counsel and enter a guilty plea. *Id.* at 398, 113 S.Ct. 2680.

[¶ 24] The United States Supreme Court has recently discussed the level of competence necessary to waive the right to counsel and represent oneself at trial. In *Indiana v. Edwards,* the Court noted, "In certain instances an individual may well be able to satisfy *Dusky*'s mental competence standard, for he will be able to work with counsel at trial, yet at the same time he may be unable to carry out the basic tasks needed to present his own defense without the help of counsel." *Indiana v. Edwards,* —— U.S. ——, ——, 128 S.Ct. 2379, 2386, 171 L.Ed.2d 345 (2008). Allowing an individual to proceed without counsel in such circumstances could result in trials that are either not fair or do not "appear fair to all who observe them." *Id.* at 2387 (quoting *Wheat v. United States,* 486 U.S. 153, 160, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988)). Thus, the Court explained, an additional determination is required when an individual wants to waive the right to counsel and conduct the trial. The Court concluded, "[T]he Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so." *Id.* at 2387–88. District courts can reject a defendant's waiver of the right to counsel if the defendant suffers from mental illness or impairment such that the defendant would not be competent to conduct trial proceedings without counsel, even if the defendant is otherwise competent to stand trial. *Id.* at 2388.

[¶ 25] The United States Supreme Court explained trial judges "will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Id.* at 2387. This Court has also emphasized the superior position of trial courts to make individualized determinations. "We have repeatedly stated a

'cold record' is no substitute for the opportunity of the trial judge to observe and evaluate the witnesses and that we are unwilling to 'second-guess' the trial court in matters which depend upon the trial judge's observations of the proceeding." *Hansen v. Winkowitsch*, 463 N.W.2d 645, 647 (N.D.1990) (citing *Kitzmann v. Kitzmann*, 459 N.W.2d 789 (N.D.1990)). District courts that can ask questions and observe the behavior of individual defendants are in a better position than appellate courts to determine whether a defendant who is competent to stand trial is competent to conduct his or her own defense.

[¶ 26] *Edwards* indicates the district court has a continuing responsibility during trial to determine whether a self-represented defendant is competent to present his or her own defense. The United States Supreme Court explained, "Mental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways." *Edwards*, 128 S.Ct. at 2386. This is true as a trial progresses, as well. A self-represented defendant that a district court determines to be competent at a pre-trial hearing may later suffer symptoms of mental illness that render him or her incapable of self-representation. The district court has a continuing responsibility to ensure the defendant is afforded a fair trial. As the United States Supreme Court noted, "The Constitution would protect none of us if it prevented the courts from acting to preserve the very processes that the Constitution itself prescribes." *Id.* at 2387 (quoting *Illinois v. Allen*, 397 U.S. 337, 350, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring)). To ensure the defendant is afforded a fair trial, a district court can appoint counsel for the defendant during trial if the court determines the defendant is no longer competent to present his or her own defense.

[¶ 27] Here, the evaluator at the State Hospital concluded Dahl was schizophrenic and had an unspecified personality disorder, but that he was competent to stand trial. The district court determined Dahl was competent to stand trial. Dahl argues his performance during trial shows he was not competent to represent himself and the district court should have appointed counsel for him. From our reading of the record, Dahl did not display symptoms of mental illness such that the district court should have determined he was incompetent to represent himself. Some of his questions may appear to be inappropriate, but he also asked many relevant questions, attempted to impeach witnesses, and appeared to have a trial strategy. His decision to proceed without counsel may not have been wise, but Dahl was competent to make that decision. *See Harmon*, 1997 ND 233, ¶ 23, 575 N.W.2d 635 (citing *Godinez*, 509 U.S. at 400, 113 S.Ct. 2680) (suggesting the defendant's decision to proceed without counsel may have been an error in judgment, but was still voluntarily and intelligently made). The district court had the opportunity to observe Dahl's actions and demeanor and properly determined Dahl was competent to stand trial and to conduct the trial himself.

### D.

[¶ 28] Before accepting a defendant's waiver of the right to counsel, the district court must conduct a two-part inquiry. *Holbach*, 2007 ND 114, ¶ 9, 735 N.W.2d 862 (citing *State v. Dvorak*, 2000 ND 6, ¶ 12, 604 N.W.2d 445; *Rockwell*, 1999 ND 125, ¶ 9, 597 N.W.2d 406; *Harmon*, 1997 ND 233, ¶ 22, 575 N.W.2d 635). "First, the Court must determine whether the waiver is voluntary." *Id.* at ¶ 10.

"Second, the Court must determine whether the waiver is knowingly and intelligently made. 'A knowing and intelligent waiver requires a defendant be aware of the dangers and disadvantages of self-representation so the record establishes the defendant knows what he is doing and his choice is made with eyes open.'" *Id.* (quoting *Dvorak*, at ¶ 16). A specific on-the-record warning is not required. *Id.* (citing *Dvorak*, at ¶ 16). However, "we prefer that trial courts eliminate any ambiguity about a waiver by making a specific on-the-record decision the defendant voluntarily, knowingly, and intelligently waived the right to counsel." *Id.* at ¶ 8 (quoting *Dvorak*, at ¶ 11). The test focuses on what the defendant understood. *Id.* at ¶ 12 (citing *Dvorak*, at ¶ 16).

[¶ 29] For a waiver of the right to counsel to be voluntary, "the trial court must inquire into the reasons for the defendant's dissatisfaction with his counsel to ensure that the defendant is not exercising a choice between incompetent or unprepared counsel and appearing pro se." *State v. Fischer*, 2008 ND 32, ¶ 20, 744 N.W.2d 760 (quoting *United States v. Silkwood*, 893 F.2d 245, 248 (10th Cir.1989)). During the pretrial hearing, Dahl and the district court discussed at length the difficulties Dahl was having with his court-appointed attorney and whether Dahl wanted to continue with his attorney or represent himself. Dahl elected to represent himself. Dahl did not allege, nor is there any indication in the record, that Dahl's court-appointed counsel was incompetent. Dahl simply disagreed with his attorney on trial strategy. The district court determined Dahl was not choosing between incompetent counsel and self-representation. Thus, the district court properly determined Dahl's waiver of his right to counsel was voluntary.

## E.

[¶ 30] The district court repeatedly discussed the dangers of self-representation with Dahl. These discussions took place during the pretrial hearing and during the trial itself. Dahl expressed his understanding of the danger when he said he would rather represent himself, call all the witnesses he wanted, and go to jail than be represented by an attorney that would not call all of his desired witnesses. The warnings the district court provided ensured Dahl knew what he was doing and his choice was made with eyes open. *Holbach*, 2007 ND 114, ¶ 12, 735 N.W.2d 862 (citing *Dvorak*, 2000 ND 6, ¶ 16, 604 N.W.2d 445). Dahl was aware of the dangers of self-representation and chose to dismiss his attorney anyway. Dahl's decision was knowingly and intelligently made, regardless of whether he performed effectively as his own attorney. *Harmon*, 1997 ND 233, ¶ 23, 575 N.W.2d 635 (citing *Godinez*, 509 U.S. at 400, 113 S.Ct. 2680). The district court properly determined Dahl waived his right to counsel knowingly and intelligently.

## F.

[¶ 31] Dahl now asserts the district court should have appointed standby counsel. A court may appoint standby counsel to assist a defendant, or to represent him if self-representation must be terminated. *State v. Curtis*, 2009 ND 34, ¶ 15, 763 N.W.2d 443 (citing *State v. Hart*, 1997 ND 188, ¶ 6, 569 N.W.2d 451). However, there is no constitutional right to standby counsel. *Id.* (citing *State v. Ochoa*, 2004 ND 43, ¶ 29, 675 N.W.2d 161; *Rockwell*, 1999 ND 125, ¶ 18, 597 N.W.2d 406). Because Dahl had no right to court-appointed standby counsel, the district court's failure to appoint standby counsel was not error.

## G.

[¶ 32] Dahl also argues sufficient evidence was not presented to support his conviction. Section 12.1–17–03, N.D.C.C., states: "A person is guilty of an offense if he creates a substantial risk of serious bodily injury or death to another.... There is risk within the meaning of this section if the potential for harm exists, whether or not a particular person's safety is actually jeopardized." Looking to the origins of our Criminal Code is helpful when applying this statute. Title 12.1, N.D.C.C., is modeled on the proposed Federal Criminal Code, which relied heavily on the Model Penal Code. *State v. Meier,* 422 N.W.2d 381, 383–84 (N.D.1988) (citing *State v. Trieb,* 315 N.W.2d 649, 657 n. 9 (N.D.1982)). The comments to the Federal Criminal Code indicate a defendant need not actually endanger anyone to be guilty of reckless endangerment. *Id.* at 384 (citing Working Papers of the National Commission on Reform of Federal Criminal Laws, Vol. II, pp. 836–37 (1970)). In addition, the Model Penal Code included a presumption that recklessness and danger existed if the defendant pointed a gun at or in the direction of a person, whether or not the defendant believed the gun to be loaded. *Id.* (citing Model Penal Code § 211.2). The comments to the Model Penal Code state, as an example, that "firing a gun at an occupied building may suffice for liability, even if none of the inhabitants is at home at the time." *Id.* (quoting Model Penal Code and Commentaries, Vol. I, pt. II, Commentary to § 211.2 (1980)).

[¶ 33] In *Meier,* this Court upheld the reckless endangerment conviction of a defendant that pointed an unloaded firearm at law enforcement officers. *Id.* at 386. In this case, the evidence indicates Dahl did much more than point an unloaded weapon. Kerber's employee testified Dahl pointed a gun in her direction and fired shots at the house. Dahl admitted he fired shots that probably hit the house, and he knew Kerber and his employee were in the house. This is exactly the type of behavior the commentary to the Model Penal Code describes as reckless endangerment. *Id.* at 384 (citing Model Penal Code and Commentaries, Vol. I, pt. II, Commentary to § 211.2 (1980)). Although the testimony about what happened when Dahl and Lende arrived conflicts, this Court does not reweigh conflicting evidence on appeal. *Demarais,* 2009 ND 143, ¶ 7, 770 N.W.2d 246 (citing *State v. Hidanovic,* 2008 ND 66, ¶ 44, 747 N.W.2d 463). Viewing the evidence in the light most favorable to the verdict, the State presented sufficient evidence to allow the jury to draw inferences reasonably tending to prove Dahl was guilty of reckless endangerment.

[¶ 34] We affirm the district court's criminal convictions. We remand to the district court to correct the criminal judgments to indicate Dahl was convicted in jury trials, not by pleas of guilty.

[¶ 35] CAROL RONNING KAPSNER, MARY MUEHLEN MARING, DANIEL J. CROTHERS, and DALE V. SANDSTROM, JJ., concur.